NEW ENGLAND MORTGAGE SECURITY COMPANY, APPELLANT, v. HENRY HENDRICKSON ET AL., APPELLEES.

**Usury**: PRINCIPAL AND AGENT. Where a person holding himself out as agent made a loan of $250, and retained $61 out of that sum for commissions, *Held*, That in the absence of a special denial by the alleged principal of such agency, a judgment finding that such agency existed will not be disturbed. LAKE, CH. J., dissents.

REHEARING of case reported, *ante* p. 157.

*Hull & Stearns*, for appellant.

*Montgomery & Harlan*, for appellees.

MAXWELL, J.

A decision was rendered in this case which is reported *ante* page 157. Afterwards a rehearing was granted and the case argued on behalf of the appellant, the principal claim being that the Corbin Banking Company was not plaintiff's agent in making the loan.

It appears from the record that in September, 1876, the following advertisement ·was published in the York *Republican*:

"*Money to loan* on five years time: on well improved farms of 80 acres and upward, in York county, at 10 per cent interest per annum; and a commission of 20 per cent is charged by the company. Final receiver's receipts are as good as patents to secure these loans, and money can be had in from 10 to 30 days from the date of proving up.

"F. W. LIEDTKE."

The testimony shows beyond question, that Liedtke stated to the defendant that he was loaning money for the plaintiff (see testimony of Reed, page 14 of the record), and also shows that the defendant did not employ the Banking Company or Liedtke as agent to procure a loan for him. Hendrickson testifies: " I asked him (Liedtke) if he had money to loan, and he said he had, and said he would like to loan me some money. He said he knew I had a good place and could get money on it, and I said all right; and we talked the matter over how much I wanted, and he said he thought I could get it. That is all that was said at the time I made the application, that I remember of."

Q. State what was said and done when the money came and you were notified?

A. I came up for it when I was notified the money was here, and he fixed up the papers, and I and my wife both signed them, and he handed me a draft for $200, and I looked at it a little bit and said is that all the money?

Q. What papers do you mean were fixed up?

A.   The note and mortgage.  And I said how do you make that out, and he said that is the way the company do.  The fair and square understanding between him and me was as we talked it over, that he was to have 20 per cent commission on the money I got, and he took 25 per cent.  He took $50 dollars out of the money.  The draft was right there, but I never touched it; and he said there is $11 more to come out of it; and I said where will I get the money on it, and he said at McWhirter's, a little bank over there, and then he said I guess I can give you the money for it, and he took $11 out of that, $9 for making out the papers, and $2 for an abstract of title.

Q.   How much did you give your note for at the time?

A.   For $250.

Q.   The coupon interest notes?

A.   Yes sir.

Q.   State what was done when he first presented this note and mortgage and said to you how much he would take out, what you did?

A.   I had them all signed before I knew anything about it; and I told him he could just take the whole thing if he was going to take out $20 or $25 more than he agreed to; and I did not take the money for an hour or two, and told him I would not take the loan at all; and he said it did not matter to him whether I did or not, but that I would be compelled to pay the $50 anyhow.  I thought may be I had better take it if I had to pay it anyhow, that is, this $50.

Q.   Then did you accept the loan under that condition, taking $50 and $11 for expenses?

A.   Yes, sir.

Q.   How much money did you actually get?

A.   I think $189.  It lacked $11 of being $200.

The defendant was told that he must sign an application for the money, and this so-called application being on a

printed form and presented by a gentleman in good standing in the community and holding an important public office, was signed without being read by the defendant, evidently supposing it to be what it was represented—an application. He had no thought of employing the Corbin Banking Company as agent to procure a loan for him, and the Corbin Banking Company did not, so far as appears, hold itself out to the public, in York county at least, as a mere agency. There was no contingency about the loan. If the security was satisfactory, which Liedtke stated it was, all that the borrower was to do was to apply for and receive the money upon the execution of the note and mortgage. The defendant also called the county clerk of York county and offered to prove that the plaintiff had a large amount of money loaned on mortgages on real estate in York county, and that the business was transacted through Liedtke. This testimony was excluded, but upon what ground does not appear. In this the court erred, as it was testimony tending to prove that Liedtke was the plaintiff's agent. There is sufficient in the record, however, to show that the plaintiff has loaned a large amount of money in York county, and that this money was loaned through F. W. Liedtke. These are facts that are not specifically denied, in fact most of them not denied at all. To merely deny that the plaintiff had any agents or brokers, in view of the testimony in this case, is not such denial, because it is apparent from Saltonstall's testimony that he relies entirely on the fact that the plaintiff had not specially appointed agents, and that is as far as his denials extend.

It is very clear that this is a cunningly devised scheme to evade the usury laws. Such subterfuges certainly should not be favored, nor should such grasping rapacity as is shown in this case be encouraged. The judgment of the district court is clearly right and is affirmed.

JUDGMENT AFFIRMED.

LAKE, CH. J., dissents.